## Wytheville.

## CITY OF HAMPTON V. WATSON.

### June 8, 1916.

### Absent, Cardwell, J.

1. WATERS AND WATER COURSES—*Tidal Waters—Ownership—Pollution.*—
   There is a marked and well defined distinction between the pollution
   of a small non-navigable stream, and the pollution of large tidal
   navigable bodies of salt water, for the reason that in the first case
   the bed of the stream and the waters are owned by the riparian owners,
   while in the latter case the bed of the navigable, tidal salt water and
   the waters themselves are owned and controlled by the State, for the
   use and benefit of all the public, subject only to navigation. It is
   for the State to say what uses shall be made thereof and by whom,
   subject always to the right of the public, and for the State, through
   the legislative branch of the government to say how much pollution
   it will permit to be emptied into and upon its waters, so long as the
   owners of the land between low water and high water mark are not
   injured.
2. WATERS AND WATER COURSES—*Tidal Waters—Pollution by Sewage—
   Municipal Corporations.*—A municipal corporation situated on an arm
   of the sea, adjacent to tidal waters, has the right to use such waters
   for the purpose of carrying off its refuse and sewage to the sea, so long
   as such use does not create a public nuisance, and any injury occa-
   sioned thereby to private oyster beds is *damnum absque injuria.*

Error to a judgment of the Circuit Court of Eliza-
beth City county in an action of trespass on the case.
Judgment for the plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*W. C. L. Taliaferro* and *J. A. Massie,* for the plain-
tiff in error.

*S. J. Dudley* and *C. V. Spratley*, for the defendant in error.

HARRISON, J., delivered the opinion of the court.

This action of trespass on the case was brought by S. J. Watson, Sr., against the city of Hampton to recover damages for its alleged unlawful pollution of the waters of Hampton creek by the sewers of the defendant city emptying therein, whereby the oyster bed of the plaintiff was materially damaged. The trial in the circuit court resulted in a verdict and judgment in favor of the plaintiff for $4,500, which we are asked to review and reverse.

It appears from the record that the city of Hampton is situated on the waters of Hampton creek, which is a large tidal, navigable body of salt water—an arm of the sea. The plaintiff is in possession of and rents from the State of Virginia three pieces of oyster planting ground, aggregating about eleven acres, located in Hampton creek and within the corporate limits of the city of Hampton. The lease of one piece of this oyster planting ground containing five acres expired in 1912, and was not renewed until after the institution of this suit in 1915, although the plaintiff, during the interval, paid the taxes thereon to the State without any reassignment having been made to him.

The city of Hampton constructed its sewers in 1899-1900, and in 1908, after an extension of the city limits, it constructed additional sewers all of which empty into Hampton creek at various places. It further appears that long prior to the construction by the defendant city of its sewer system, there were, and still are, private sewers and overhanging closets which

emptied into these waters, including the county poor-house, the normal school with eleven hundred negro and Indian pupils and teachers, and the National Soldiers' Home, with over three thousand inmates; and that such sewers and closets have continuously and do now drain and empty directly into Hampton creek, and are not connected with any city sewer. The evidence shows that the sewerage from these private sources is many times more than sufficient to pollute the waters in question, so as to forbid the sale of oysters directly therefrom. It further appears that in the summer of 1909, the oyster planters in Hampton creek were notified by the health officer of the county that those waters were too polluted to permit the sale of oysters therefrom, and again in 1914, the United States health authorities made an examination and found that the waters were too polluted for oysters to be sold directly therefrom, and thereupon the Pure Food and Dairy Department of the State of Virginia notified the defendant in error, among others, that they would not be permitted to sell their oysters without first transplanting them to unpolluted waters. It is not pretended that the defendant was guilty of any negligence in the construction of its sewer system; nor is there any complaint that these waters, as a result of its sewerage, create offensive odors or are obnoxious to persons navigating the same, or to those on the shores in close proximity thereto. The sole complaint is the detriment done to the plaintiff's oyster bed.

In the view we take of this case it is only necessary to consider one of the defenses relied on by the city of Hampton. That contention is that the city is under no liability to the plaintiff for the reason that the beds and waters of Hampton creek, below low water mark, being tidal, navigable salt waters, are

7

held in trust by the State of Virginia for the public, and cannot be granted to an individual so as to impair the public interests therein, or the use thereof.

Counsel for the plaintiff, in support of their contention that the city is liable in damages to the plaintiff for the detriment done his oyster bed by emptying its sewerage into these waters, cites a number of cases in which recovery has been had for the pollution of non-navigable streams, or for emptying by cities of sewers upon private property. These cases are, however, not analogous to. the case at bar. The question of the pollution of non-navigable streams and the beds thereof, which are owned by the riparian owners, as they own the adjacent land, has been frequently considered and the right to recover damages in such cases upheld in this State. There is, however, a marked and well established distinction between the pollution of a small non-navigable stream and the pollution of large tidal, navigable bodies of salt water, for the reason that in the first case the bed of the stream and the waters are owned by the riparian owners, while in the latter case it is well settled that the bed of the navigable, tidal salt water and the waters themselves are owned and controlled by the State, for the use and benefit of all the public, subject only to navigation. It is for the State to say what uses shall be made thereof and by whom, subject always to the right of the public, and for the State, through the legislative branch of the government, to say how much pollution it will permit to be emptied into and upon its waters, so long as the owners of the land between low water and high water mark are not injured, and there is no such claim in this case.

From the early English decisions to the present time, and repeatedly by this court, it has been held

that the tidal, navigable salt waters, and the beds thereof, belong to the Commonwealth, in a sovereign capacity, for the benefit of all the public, and cannot be disposed of to the detriment of the public interest. *Taylor* v. *Com'th*, 102 Va. 768, 47 S. E. 875, 102 Am. St. Rep. 865; *N. N. S. B. & D. D. Co.* v. *Jones*, 105 Va. 503, 54 S. E. 314, 6 L. R. A. (N. S.) 247; *Ill. Cent. R. Co.* v. *Illinois*, 146 U. S. 387, 13 Sup. Ct. 110, 36 L. Ed. 1018; *Sayer* v. *Newark*, 60 N. J. Eq. 361, 45 Atl. 985, 48 L. R. A. 722, 83 Am. St. Rep. 629. *Coxe* v. *State*, 144 N. Y. 396, 39 N. E. 400.

In *Illinois Cent. R. Co.* v. *Illinois, supra*, it is said to be the settled law of this country that the ownership of and dominion and sovereignty over lands covered by tidal waters, within the limits of the several States, belong to the respective States within which they are found, with the consequent right to use or dispose of any portion thereof when that can be done without substantial impairment of the interest of the public in the waters.

The foregoing statement of the law is quoted with approval by this court in *Taylor* v. *Commonwealth, supra*, where it is further said: "It is grants of parcels of land under navigable waters that may afford foundations for wharves, piers, docks and other structures in aid of commerce, which being occupied, do not substantially impair the public interest in the lands and water remaining, that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power consistently with the trust to the public, upon which such lands are held by the State. But that is a very different doctrine from the one which would sanction the abdication of the general control of the State over lands under the navigable waters of an entire harbor or bay, or sea or lake. Such

abdication is not consistent with the exercise of that trust which requires the government of the State to preserve such waters for the use of the public. The trust devolving upon the State for the benefit of the public, and which can only be discharged by the management and control of property in which the public has an interest, cannot be relinquished by a transfer of the property. The control of the State for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein, or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining."

In *Coxe* v. *State, supra,* it is said: "That the dominion and ownership of such land is in the sovereign for the benefit of the public has long been settled. Such dominion and ownership of property generally implies the power of absolute disposition, but with respect to the land under navigable or tide waters, an important limitation has been engrafted upon this power, from the nature of the title. The title of the State to the sea coast and the shores of the tidal rivers is different from the fee simple which an individual holds to an estate in lands. It is not a proprietary, but a sovereign right, and it has been frequently said that a trust is engrafted upon this title for the benefit of the public, of which the State is powerless to divest itself . . . . The title which the State holds and the power of disposition, is an incident and part of its sovereignty that cannot be surrendered, aliened or delegated, except for some public purpose, or some reasonable use, which can fairly be said to be for the public benefit."

Since the State holds its tidal waters and the beds thereof for the benefit of all the public, we are of opin-

ion that the city of Hampton has the right to use the waters of Hampton creek for the purpose of carrying off its refuse and sewage to the sea, so long as such use does not constitute a public nuisance and as such be discontinued by the legislature, which has control over the extent to which these waters may be so used. The sea is the natural outlet for all the impurities flowing from the land, and the public health demands that our large and rapidly growing sea coast cities should not be obstructed in their use of this outlet, except in the public interest. One great natural office of the sea and of all running waters is to carry off and dissipate, by their perpetual motion and currents, the impurities and off-scourings of the land. The owner of any lands bordering upon the sea may lawfully throw refuse matter into it, provided he does not create a nuisance to others. And there can be no doubt that public bodies and officers, charged by law with the power and duty of constructing and maintaining sewers and drains for the benefit of the public health, have an equal right. *Haskell* v. *New Bedford*, 108 Mass. 208, 214.

In *Sayre* v. *Newark, supra,* it is said: "Indeed the history of sewers shows that from time immemorial the right to connect them with navigable streams has been regarded as part of the *jus publicum;* . . . and whenever tidal streams can conveniently be reached, they have been employed as the medium of discharge to the sea. Such a use of public waters must necessarily entail some defilement. The degree of pollution to be permitted is a matter over which the legislature has full power and control."

The State guards the health of its people for the benefit and protection of the public at large and under present sanitary standards, sewerage systems for all

thickly settled communities have become an imperative necessity, a public right, which is superior to the leasing by the State of a few acres of oyster land, within the corporate limits of a city, to an individual at one dollar per acre *per annum*. When the plaintiff leased this land he took it with full knowledge of the then existing sewerage emptying into Hampton creek and subject to the public right to increase the same as necessity required, on account of the growth in population of the city of Hampton.

In conclusion, we are of opinion, in the light of the authorities cited, that the defendant city was acting within its lawful right in emptying the sewerage complained of into the waters of Hampton creek, and that any injury occasioned the private oyster bed of the plaintiff thereby was *damnum absque injuria*. It follows from what has been said that the circuit court erred in giving the instructions bearing on this question asked for by the plaintiff, and in refusing those asked for by the defendant.

The judgment complained of must, therefore, be reversed, the verdict of the jury set aside, and, under our practice, the case remanded for a new trial, if the plaintiff be so advised, to be had not in conflict with the views expressed 'n this opinion.

*Reversed.*