Booth, Chief Justice,
delivered the opinion of the court:
The court’s jurisdiction to adjudicate this case is conferred by the terms of the following special act of Congress approved February 12, 1927, to wit:
“ Be it enacted by the Senate and House of Befresentatwes of the United States of America m Congress assembled, That Stanton and Jones are hereby authorized to bring suit against the United States under contract with the engineer’s office, dated June 12, 1918, for revetment work, Pelican Bend, Missouri River, to recover whatever damages or losses which they may have suffered through action by governmental agencies in commandeering, purchasing, moving, or causing to be moved from the Missouri River the fleet of the Kansas City Missouri River Navigation Company, or of any other action of governmental agencies which resulted in any loss to the claimants. Jurisdiction is hereby conferred upon the Court of Claims of the United States to hear, consider, and determine such action and to enter decree or judgment against the United States for the amount of any loss or damages as may be found to have been suffered by the said Stanton and Jones under the said contract, if any: Provided, That such action shall be brought and commenced within four months from the date this act becomes effective.”
The plaintiffs repeat a contention oftentimes made, that the only issue in the case, made so by the special act, “is the amount of such damages and losses.” In other words, the Government by the act concedes liability, and all that remains for the court to do is to assess the loss. With this contention we are disinclined to agree. Special jurisdictional *390 acts are not always clear. This one is not distinctly obscure. A suit is authorized under a contract, granting the right to recover damages suffered, if any, by reason of specified interferences with the contractor’s performance of the same, or iby the action of governmental agencies in forestalling completion of the contract work. Judgment, if any, is to be predicated upon loss or damages “under said contract, if any.” What the act provides is a forum to which the plaintiffs may resort, with the right to have the cause of action adjudicated and determined. We fail to discover in the language of the act an acknowledgment of liability; on the contrary, taken as a whole, the statute indicates an intent to transfer a contention advanced in Congress from that forum to a judicial forum; where the plaintiffs’ contractual rights may be adjudicated according to law. If Congress intended to simply ascertain the facts, the way was open under section 151 of the Judicial Code. On the contrary, both Houses of ‘Congress, with the approval of the President, confer a jurisdiction which sets forth the subject matter to be adjudicated •as well as the origin of the claim and the causes alleged to have resulted in loss and damage. United States v. Mille Lac Indians, 229 U. S. 498, 500.
The plaintiffs contracted to perform specified revetment work at Pelican Bend, in the Missouri Biver. The contract was dated June 12, 1918, and was to be completed in twelve working months, which eliminated the months of December, -January, and February, if, in the opinion of the Government’s representative in charge, work could not be continued ■during these periods. Work was commenced by the contractor on October 14, 1918, and through extensions granted ¡should have been completed by November 26, 1919. The «contract originally contemplated the construction of 11,750 ffeet of revetments to be placed in what was designated the upper and lower sections of the bend, and on March 9, 1920, an amending agreement was entered into, conferring the right upon the Government to increase or decrease the length of the work not in excess of 30 per cent of the original length. On December 13, 1920, the plaintiffs by letter requested the Government to annul the contract for the construction of the revetments designed for the upper section *391 of the bend, citing the apparent difficulties in the way of the proper completion of this portion of the work. On January 18, 1921, the Government officials acceded to the plaintiffs’ request and a supplementary agreement was entered into whereby the plaintiffs were relieved from further performance of the contract, and settled with them on the basis of approximately 6,000 feet of completed work on the lower section, in consideration of which the plaintiffs released the United States from claims arising out of the contract, including anticipated profits. See Finding XX. The plaintiffs were thereafter paid the sum of $101,998.19 and the Government purchased material on hand to the extent of $19,106.20, Finding XXI.
The record discloses that when the plaintiffs submitted their bid for the work they were not adequately equipped to perform the same. The specifications warned the contractors to visit the site and ascertain the difficulties inherent in the work. Mr. Jones, one of the partners, was not only an experienced engineer but perfectly familiar from past experience with work of this character. He knew what was essential in the way of equipment to perform the contract and also what the firm possessed. Realizing the imperative necessity for additional facilities in the matter of transportation of materials, particularly concrete blocks, an effort was made to complete an arrangement with the Kansas City Missouri River Navigation Company to convey the same from Gasconade to Pelican Bend at T cents per block. The arrangement was never consummated, for on July 30, 191’8, the aforementioned navigation company entered into negotiations with the United States Railroad Administration for the sale of its fleet and its transfer to the Mississippi River. The plaintiffs stress this so-called interference of the Government, and rely principally upon it for a large portion of the amount of damages claimed. Obviously such a claim is not sustainable under the law. The plaintiffs had .made no contract with the navigation company to transport its blocks. The most that is claimed is an arrangement to perform the service for 1 cents per block, a sum claimed to be less than the actual cost. True, the plaintiffs may have submitted their bid upon the basis of this cost, but assuredly they may not *392 be beard to complain of an error of judgment in nowise attributable to the Government. But aside from this, the record discloses and the court finds that plaintiffs’ losses were not attributable to the loss of the services of the navigation company’s fleet. This contract was entered into during the war. Plaintiffs knew of existing conditions and should have anticipated impending difficulties, which, as a matter of fact, seems to have been done, for the record firmly establishes that the plaintiffs had available, at the point of necessity more concrete blocks than they had use for, and that the taking of the fleet in nowise contributed toward delay or undue expense. So that, granting in all aspects the contention of the plaintiffs as to the jurisdictional act, the claim for loss due to the taking of the fleet is without merit. It is manifestly impossible to compute a loss upon the basis of what happened in comparison with what might have happened. The. plaintiffs fail to establish a binding obligation with the navigation company to transport blocks at a given price, and afford the court no more than preliminary negotiations looking toward an uncompleted transaction.
In the specifications, which are.by reference made a part of the findings, appears the following paragraph, viz:
“ Order of worh. — All work shall be carried on continuously from upper end. Prior to the high water season of 1918, work shall be started on one section only, which will be determined by the contracting officer. Thereafter, if. required by the contracting officer, two working parties shall be employed at such places as may be directed.”
The plaintiffs construe this paragraph as a mandatory provision exacting the commencement of the work on the upper section, and allege as a breach thereof that work was commenced upon the lower section, such work being more expensive, and completion retarded in virtue of this disadvantage. This paragraph makes specific provision for three distinct methods of procedure. First, work is to be continuously carried on from the upper end, not section, i. e., progress downstream; second, anticipating the high-water season of 1918, the work will be started on a single section to be determined by the contracting officer; and, lastly, work may be required of the contractor by the contracting *393 officer of two working parties at such places as he may direct. It is true the contractor misconceived the meaning of the paragraph and did incur a nominal expense in preparation for work on' the upper section; but before any substantial progress had been made the work was transferred to the lower section. No work whatever was thereafter done on the upper section, the contractor at its own request being relieved therefrom.
The next item predicated upon the contract involves the sum of $206.23. The plaintiffs were by the contract and specifications bound to do certain grading (Finding VIII). The contention is advanced that the required grading was accomplished, inspected, and passed and that subsequently another inspector condemned the work and required some of it to be done over. The record, it is said, discloses that the work was in precisely the same condition when condemned as it was when passed by the first inspector. The specifications made it obligatory upon the part of the contractor to protect \and maintain the integrity of the work done, and save it harmless from floods or other causes, and any injury resulting to work done was to be made good by the contractor. This is the obligation in this respect the contractor assumed, and unless the good faith of the defendant is successfully challenged, what was exacted of the contractor as to grading exposed to the winter months, in the way of repairing and completion, falls within the terms of the agreement. The specifications go into detail respecting the grading to be done, and expressly require that it shall be “ neat ” and “ first class.”
A loss is alleged to have been suffered by reason of incorrect measurements of stone. Paragraph 43 of the specifications provides as follows:
“ 43. Measurement of materials. — Anchor piles shall be 18 feet long, or, for special conditions, of such additional lengths as may be designated by the contracting officer. All measurements will be made to the nearest foot, which is the specified unit of payment for piles in place in the work.
“ Brush and cribbing poles delivered on barges or otherwise shall be compactly and evenly corded; shall be laid-straight, without criss-crossing or tangled tops. The cross-cording shall be in uniform layers two (2) to three (3) feet *394 in thickness, separated by lengthwise layers one-half (%) to one (1) foot thick. Butts of the cross-cording shall be lined and corded up evenly. .All measurements will be made to the nearest 1-tenth foot and the volume determined to the nearest whole cord, which is the specified unit of payment for brush and poles in place in the work. If any fraudulent cording or inferior material be discovered later, deductions for the same will be made, or the brush and poles may be repiled by the contractor under the supervision of the contracting officer and remeasured.
" Stone and spalls delivered on barges or otherwise shall be evenly corded up and leveled to facilitate measurement. No stone and spalls shall be mixed, but shall each be evenly corded up and leveled to facilitate a separate measurement. All measurements will be made to the nearest 1-tenth foot and the volume determined to the nearest whole cubic yard which is the specified unit of payment for stone and spalls in place in the work. If any fraudulent cording or inferior material be discovered later, deductions for same will be made, or the stone and spalls may be repiled by the contractor under the supervision of the contracting officer and remeasured.”
The gravamen of the complaint as to this item revolves about a change in. the method of measuring the stone inaugurated by the last inspector, a change which the plaintiffs designate as departing from the usual and customary method employed. The manifest error in the plaintiffs’ contention is apparent, for the contract and specifications provided the method. Whether it was customary or not is immaterial. The method employed by the final inspector is not shown to have been a departure from the contract provisions. The specifications provide for a system of cording up the stone in such a manner as to expedite measurements and fix as near as may be the exact cubic contents of the mass. To place stakes of a given height upon the barges and requiring the stone to be loaded to their level can not be said, in view of the record, to have been so glaringly erroneous as to fail to reflect within reason the cubic contents of the inclosed mass. In addition to failure to establish a departure from the contract in this respect, article 2 of the contract made the decision of the contracting officer final as to quantity and quality of materials furnished.
The item designated in plaintiffs’ brief as number 11 is for a loss ascribed to a breach by the defendant of a special *395 written agreement covering the placing of spalls during a time of flood water. The contractor solicited the privilege of placing spalls upon a specified area of mattresses during a time when the water in the river exceeded a five-foot stage,, direct from barges, and stated that if allowed the privilege a reduction in the price of such work would be made. The defendant acceded to the request in April, 1920, but the plaintiffs did not avail themselves of the change, and made no complaint until the following August, and then at a time when the stage of the river was within workable heights. The inspector in August refused permission to place the spalls from the barges awaiting a decision of the engineer officer in charge. The letter was annulled. The agreement to place the spalls from barges was not without limitations. It was favorable to the plaintiffs and designed to protect their work in flood stages of the river. The record shows . that the plaintiffs failed to take advantage of it until the conditions under which they might so do had passed. The burden of proof is with the plaintiffs, and the record establishes a failure to prove a disallowance to proceed under the special agreement of April, 1920, of such an extent as to cause a loss.
The remaining items in suit will not be discussed. They pertain to interest, loss of profits, and losses incident to the taking over by the Government of the Missouri River Navigation Company’s fleet. The findings disclose the facts. The case, we think, is one of fact.
The petition will be dismissed. It is so ordered.
GeeeN, Judge, and GRAham, Judge, concur.